******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PENNY OUDHEUSDEN *v.*
PETER OUDHEUSDEN
(AC 41050)

Alvord, Keller and Eveleigh, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court dissolving his marriage to the plaintiff and issuing certain financial orders. The defendant claimed that the trial court improperly double counted a certain marital asset for purposes of property division and spousal support awards, and abused its discretion in failing to make equitable orders in the division of the marital estate. *Held*:

1. The trial court impermissibly double counted the value of the defendant's businesses for purposes of the property division and spousal support awards; that court, which awarded the plaintiff 50 percent of the fair market value of the defendant's businesses and $18,000 per month in lifetime alimony, failed to take into account that the defendant's annual gross income was included in the fair market value of his businesses, and because his businesses provided the stream of income with which he was to pay the monthly alimony award, the defendant was left without resources with which to comply with the court's orders and had no other assets available to satisfy all of the court-ordered payments.

2. The trial court abused its discretion in failing to make equitable orders in the division of the marital estate, as the court's financial awards were inequitable in that the court deprived the defendant of the means with which to comply with those orders when it awarded the plaintiff 50 percent of the value of the defendant's businesses, which provided his stream of income; moreover, the facts in evidence did not support the court's award of nonmodifiable, lifetime alimony to the plaintiff, the effect of which was to bar the defendant from seeking a modification even if he became seriously ill or the businesses failed to thrive or survive through no fault of his own, and which did not take into account his ability to generate the same amount of income as he grew older or contemplate his retirement, and the plaintiff's testimony at trial precluded the conclusion that her physical condition and age rendered her permanently incapable of earning any income from any type of employment, as it was evident from the plaintiff's testimony that she expected to secure some type of employment, even if the salary was less than what she would have liked it to be.

Argued February 14—officially released May 21, 2019

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, and tried to the court, *Tindill, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court; thereafter, the court, *Tindill, J.*, granted the defendant's motion for clarification. *Reversed in part*; *further proceedings*.

*Yakov Pyetranker*, for the appellant (defendant).

*Scott T. Garosshen*, with whom was *Kenneth J. Bartschi*, for the appellee (plaintiff).

*Opinion*

ALVORD, J. The defendant, Peter Oudheusden, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Penny Oudheusden, and entering certain financial orders. On appeal, the defendant claims that the court (1) improperly double counted a marital asset[1] for purposes of the property division and spousal support awards, and (2) abused its discretion in failing to make equitable orders in the division of the marital estate. We agree and, accordingly, reverse in part the judgment of the trial court and remand the case for a new trial on all financial issues.

The record reveals the following facts, as found by the trial court[2] or undisputed, and procedural history. The parties were married on June 29, 1985, and have three adult children. On April 1, 2016, the plaintiff commenced the present action against the defendant seeking to dissolve their thirty year marriage on the ground of irretrievable breakdown. Following extensive discovery disputes, the dissolution trial took place over nine days in April and May, 2017. The defendant was self-represented at the time of trial.[3] During the trial, the court heard testimony from the plaintiff, the defendant and each of their expert witnesses, and the court admitted 199 exhibits into evidence.

The plaintiff was born in Greenwich in 1961. The parties started dating in high school. Prior to their marriage in 1985, the plaintiff obtained an undergraduate degree in international marketing and a master's degree in education. She was employed as a teacher until 1988, when she left the workforce to raise their family. The parties agreed that the plaintiff would remain a full-time homemaker, and the defendant would provide the financial support for the family.

The defendant has a double major in English and computer science. He had worked at various companies during the earlier years of the marriage, which often resulted in the family moving from one location to another. In 1997, the defendant started his own business called Connecticut Computer & Consulting, Inc. At that time, the defendant was the sole employee of the corporation, which is a consulting practice with clients in the pharmaceutical industry. The defendant formed his second business, WriteResult, LLC, a limited liability company, in 2007. This company complements Connecticut Computer & Consulting, Inc., and provides services to the same or comparable clients. WriteResult, LLC, uses different computer technologies to collect patient data, and there is a heavy hardware component involved in its work. The defendant owns and manages both businesses, and he derives all of his income from his self-employment. The plaintiff always has been supportive of the defendant's business endeavors.

The plaintiff testified that, during the course of the

marriage, the defendant abused her emotionally and, at times, physically. The plaintiff also was troubled by the defendant's consumption of alcohol. Problems surfaced early in the marriage when the defendant told the plaintiff that their financial situation was dire, and he continued to voice his concerns about expenditures throughout the marriage. The plaintiff believed the defendant's statements because she trusted him, and she never sought documentation to verify their monetary problems. Creditors called frequently. She acknowledged that she had been aware from the beginning of the marriage until the time she initiated the dissolution proceedings that they had outstanding federal and state tax liabilities.

Nevertheless, the parties purchased a home in Greenwich for $1.5 million in 2002, and proceeded to engage contractors to perform improvements and renovations to the marital property. Their three children attended private and public schools before their college years. Following their secondary education, one son attended law school and one son attended medical school. Their daughter attended Dartmouth College. The parties were in total agreement when it came to sending their children to these educational institutions, and the defendant paid all of the substantial expenses from his earnings.

At the time of trial, the plaintiff was fifty-five years old and the defendant was fifty-eight years old. With respect to their health, the plaintiff had a little bit of trouble with her hearing, and she testified that she recently had ordered hearing aids. She also testified that she had been diagnosed with melanoma on the side of her nose in 2011, had it surgically removed, and was cancer free at that point. The defendant testified that he was in good health. He acknowledged that he considered himself an alcoholic, but he indicated that he had not had a drink in nearly six months. With respect to employment, the plaintiff was not working and no longer had a current license to teach. The defendant had hoped to retire when he reached sixty-five years of age and, if possible, engage in some limited consulting work. He testified that the parties did not have a retirement account.

Aside from the two businesses, the only other significant marital property was the marital home in Greenwich. It had an appraised value of $1.7 million, but was encumbered by two mortgages and tax liens. The defendant ceased making payments on the first mortgage in October, 2015, and a foreclosure action was pending at the time of trial. The parties had significant debts. In addition to federal and state tax liabilities,[4] the plaintiff and the defendant, who previously had been represented by counsel in this action, owed substantial fees to their counsel and their experts.

The fair market value of the defendant's two busi-

nesses was a key issue in these proceedings. The plaintiff's expert, James R. Guberman, and the defendant's expert, Mark S. Gottlieb, provided extensive testimony as to the methodologies used and the conclusions reached as to valuation. The court credited Guberman's testimony that the combined fair market value of Connecticut Computer & Consulting, Inc., and WriteResult, LLC, was $904,000. The court further found that the defendant's gross annual income from these businesses was $550,000.

The parties submitted current financial affidavits and proposed orders to the court at the conclusion of the trial. During his cross-examination of Guberman, his closing argument, and in his proposed orders, the defendant cautioned the court against double counting the value of his businesses and his salary in dividing the marital estate and in awarding alimony. Additionally, the plaintiff's counsel, in his closing argument and in the plaintiff's proposed orders, acknowledged the danger of double counting an asset for purposes of the property division and support awards. In his closing argument, the plaintiff's counsel stated: "[A]nd I will concede this to [the defendant]. And this is reflected in paragraph 2.4 of article two of our proposed orders that were filed today.[5] Whatever value the court attributes to the business, the court has to, and should back out a reasonable salary for the officer and owner of the company.

"Because if the court is going to set a support order based on his income, it would not be fair and equitable to also ask that he pay an equitable distribution based on that as well.

"That would be double dipping. That was what [the defendant] was trying to get to when he was going through his examination. *Because that salary is—of the officer of the company—the owner of the company, is included in the overall valuation.* So that must be backed out." (Emphasis added; footnote added.)

The court issued its memorandum of decision on November 3, 2017. After concluding that the parties' marriage had broken down irretrievably, the court made, inter alia, the following "key findings": (1) The defendant was at fault for the irretrievable breakdown of the marriage;[6] (2) the defendant had been the sole financial support of the family since 1988, and the plaintiff had made significant, nonfinancial contributions to the family; (3) the self-employed defendant owned two businesses and had, for the past thirty-two years, intentionally concealed the exact nature of the businesses and marital finances from the plaintiff; (4) the defendant's gross annual income was $550,000; (5) the combined value of the defendant's two businesses was $904,000; (6) a lifetime periodic alimony award to the plaintiff was appropriate and necessary; (7) the defendant's failure to maintain the marital home and his failure to make mortgage payments since October 1,

2015, caused a loss of equity in the home in the amount of $162,339.89; and (8) the plaintiff's testimony was credible, while the defendant's testimony regarding his annual income, profit, cash flow, business and personal expenses was not credible.

In its memorandum of decision, the court entered orders regarding alimony, property distribution, and attorney's fees. The court awarded the plaintiff alimony in the amount of $18,000 per month, payable November 13, 2017, and every month thereafter, until the plaintiff's death, remarriage, cohabitation or civil union. The alimony award was nonmodifiable as to duration and amount. The defendant was responsible for all outstanding mortgage, insurance and taxes due and owing on the marital home. The defendant was further ordered to pay the plaintiff $221,677 no later than June 1, 2018, which represented 100 percent of the net equity in the marital home if the defendant had made the mortgage payments when due. With respect to the defendant's two businesses, he was to retain 100 percent ownership, but was ordered to pay the plaintiff 50 percent of the fair market value, i.e., $452,000, no later than February 28, 2018. The defendant was responsible for all outstanding federal and state taxes, including interest and penalties, for the years 1985 through 2015, and the defendant was responsible for any tax liability for 2016. The court ordered the defendant to obtain and maintain, within forty-five business days of the court's decision, a ten year term life insurance policy naming the plaintiff as the sole beneficiary in the amount of $2 million.[7] Finally, the defendant was ordered to pay all of the plaintiff's legal, expert, and professional fees, which totaled $223,398. The fees were to be paid no later than December 31, 2017, or, alternatively, the defendant was to obtain a written, agreed upon installment plan with the named creditors no later than December 31, 2017.

The defendant appealed from the court's judgment on November 14, 2017.[8] On March 7, 2018, the defendant filed a postjudgment motion for clarification. In his motion, he stated that the court had found his gross annual income to be $550,000. The defendant requested clarification as to the following: "Is the $550,000 amount the defendant's earning capacity? If so, is it his earning capacity at his two wholly owned companies, or what he can realistically be expected to earn elsewhere independent of said companies?" On April 3, 2018, the court granted the defendant's motion and responded to the request as follows: "The court's finding that the [d]efendant's annual gross income is $550,000, is not a finding of earning capacity, but of (gross) income from Connecticut Computer & Consulting, [Inc.], and WriteResult, LLC."

We begin our analysis of the defendant's claims by setting forth the standard of review. "An appellate court will not disturb a trial court's orders in domestic rela-

tions cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Furthermore, [t]he trial court's findings [of fact] are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Steller* v. *Steller*, 181 Conn. App. 581, 587–88, 187 A.3d 1184 (2018).

I

The defendant first claims that the court improperly double counted a marital asset for purposes of property division and spousal support awards. Specifically, the defendant argues that the court improperly awarded the plaintiff alimony from income that was generated by the defendant's two businesses and awarded her 50 percent of the value of those businesses. The plaintiff counters that "an impermissible double dip would have occurred here only if the trial court had given 100 [percent] ownership of the businesses to [the] [p]laintiff and then ordered [the] [d]efendant to pay alimony based on income from an asset he no longer had as a result of the transfer, making compliance infeasible." (Emphasis omitted.) We agree with the defendant that, under the circumstances of this case, the court effectively deprived the defendant of his ability to pay the $18,000 monthly alimony award to the plaintiff by also distributing to the plaintiff 50 percent of the value of his businesses from which he derives his income.

The general principle is that a court may not take an income producing asset into account in its property division and also award alimony based on that same income. See *Callahan* v. *Callahan*, 157 Conn. App. 78, 95, 116 A.3d 317, cert. denied, 317 Conn. 913, 116 A.3d 812 (2015) and cert. denied, 317 Conn. 914, 116 A.3d 813 (2015). The plaintiff claims that because the defendant retained 100 percent of the ownership in his two businesses, he still had an income stream from which to make the alimony payments. The plaintiff argues that the case of *O'Brien* v. *O'Brien*, 326 Conn. 81, 161 A.3d 1236 (2017), requires the transfer of the entire income producing asset to the party receiving support in order to constitute an impermissible double counting situation. The plaintiff cites the following language from *O'Brien* in support of this position: "A trial court's alimony award constitutes impermissible double dipping only if the court considers, as a source of the alimony

payments, assets distributed to the party *receiving* the alimony." (Emphasis in original.) Id., 120. We do not read *O'Brien* as expansively as the plaintiff. To do so would lead to an unworkable and nonsensical result.

If we follow the plaintiff's interpretation of *O'Brien*, a court could award 99 percent of the income producing asset to the party receiving alimony and still not engage in impermissible double counting of marital assets. We conclude that *O'Brien* does not require the application of a bright line rule when a court double counts an income producing asset for purposes of property distribution and support awards. In marital dissolution cases, each situation is fact specific and the court, in formulating its orders, must take into account all of the assets in the marital estate as well as other statutory considerations. See General Statutes §§ 46b-81 and 46b-82. "The court must be free to shape its awards in a manner which it determines is fair and equitable under the circumstances." *Sweet* v. *Sweet*, 190 Conn. 657, 662, 462 A.2d 1031 (1983). For that reason, there can be no general prohibition against awarding alimony from an income producing asset that has been partially conveyed to the party receiving support if, for example, there are other assets available to fund alimony payments. Moreover, an actual conveyance of the interest in the income producing asset to the party receiving alimony is not required to constitute impermissible double counting if the paying party in practical effect has been deprived of the value of that asset.

In the present case, the court failed to take into account that the defendant's annual gross income, which the court determined to be $550,000, was included in the fair market value of the defendant's two businesses. As the court acknowledged in its April 3, 2018 clarification, its determination of the defendant's income flowed solely from the defendant's businesses and was not based on his earning capacity.[9] Nevertheless, the court awarded the plaintiff 50 percent of the $904,000 fair market value of the businesses and awarded the plaintiff $18,000 per month in lifetime alimony. These orders ignored the economic relationship between the value of the businesses and the defendant's ability to earn income. The defendant's businesses provided the only significant stream of income by which the defendant could meet his alimony and other court-ordered payment obligations.

The defendant was ordered to pay the first monthly alimony payment of $18,000 ten days after the issuance of the court's memorandum of decision and an amount equal to 50 percent of the value of the businesses, i.e., $452,000, four months thereafter. Moreover, the defendant was ordered to pay $221,677, which the court determined to be 100 percent of the net equity in the marital home, three months after paying 50 percent of the value of the businesses. Additionally, the defendant was

solely responsible for all of the outstanding mortgage payments, insurance and taxes due and owing on the marital home since October, 2015, and he was responsible for all federal and state tax liabilities for the years 1985 through 2016. Finally, he was ordered to pay the balance of all of the plaintiff's legal, expert, and professional fees, i.e., $223,398, within two months of the court's judgment or, in the alternative, to secure a written, agreed upon installment plan with the creditors of those fees within that time period.[10]

Because the defendant's businesses provided the stream of income with which the defendant was to pay the monthly alimony award and because the court awarded the plaintiff 50 percent of the value of those businesses, the defendant was left without resources with which to comply with the court's orders. He had no other assets available to satisfy all of the court-ordered payments. Given the circumstances of this case, we conclude that the court impermissibly double counted the value of the defendant's businesses for purposes of property division and spousal support awards.

## II

The defendant next claims that the court abused its discretion in failing to make equitable orders in the division of the marital estate. Specifically, he argues that the plaintiff was awarded the entire net marital estate while the defendant was held responsible for all of the marital debts. The defendant claims that there was no finding of an intentional dissipation of marital assets and that the plaintiff and the family had benefitted from the decisions made throughout the marriage to defer tax liabilities, to pay for all of the children's educational expenses, and to otherwise provide for the lifestyle to which they had become accustomed. He further argues that the court's award of nonmodifiable, lifetime alimony was not supported by the evidence at trial.

We agree that the court's financial awards were inequitable because, as previously discussed, the court deprived the defendant of the means with which to comply with those orders. We further conclude that the award of nonmodifiable, lifetime alimony was not supported by the facts as found by the court.[11]

Again, we are mindful of the court's broad discretion in dividing the marital estate in domestic relations matters. *Merk-Gould* v. *Gould*, 184 Conn. App. 512, 516, 195 A.3d 458 (2018). Further, "there is no presumption in Connecticut that marital property should be divided equally prior to applying the statutory criteria." (Internal quotation marks omitted.) *Kaczynski* v. *Kaczynski*, 124 Conn. App. 204, 213, 3 A.3d 1034 (2010). We also are mindful, however, of "the long settled principle that the defendant's ability to pay is a material consideration

in formulating financial awards." (Internal quotation marks omitted.) *Pellow* v. *Pellow*, 113 Conn. App. 122, 129, 964 A.2d 1252 (2009).

Although the trial court stated that it had considered all of the statutory criteria and all of the evidence when it fashioned the financial awards, its final judgment indicates otherwise. It is true that the court was not required to establish a plan for the defendant that detailed the steps he had to take in order to comply with the court's financial orders. The court was required, however, to provide the defendant with the financial tools necessary to comply with its orders. See *Wood* v. *Wood*, 160 Conn. App. 708, 726, 125 A.3d 1040 (2015).

One of those orders was to pay the plaintiff alimony in the amount of $18,000 per month, beginning November 13, 2017, and each month thereafter on the thirteenth of the month, until the plaintiff's death, marriage, cohabitation, or civil union, whichever occured first. The alimony award was nonmodifiable as to duration and amount. The effect of this order was to bar the defendant from seeking a modification even if he became seriously ill or the businesses failed to thrive or survive through no fault of his own. The defendant was fifty-eight years old at the time of trial, and the court's order did not take into account his ability to generate the same amount of income as he grew older nor did it contemplate his retirement. The court justified this nonmodifiable, lifetime alimony order on the following basis: "The purpose of the [c]ourt's alimony award is to provide a measure of financial security to the [p]laintiff who has not worked outside of the marital home in nearly three decades, has $2,095 in retirement funds, and has significantly less ability to acquire income or assets in the future than does the [d]efendant. The [p]laintiff has limited earning potential. She is [fifty-five] years old, hearing-impaired, and a cancer survivor. The [p]laintiff earned a bachelor's degree in international marketing from Simmons College and a master's degree in teaching from the University of Bridgeport. She is no longer licensed to teach."

The plaintiff's own testimony at trial precluded the conclusion that her physical condition and age rendered her permanently incapable of earning any income from any type of employment. Although her teaching certificate was no longer valid, the court did not consider the possibility that the plaintiff could seek recertification.[12] The plaintiff, although she testified that she had ordered hearing aids, acknowledged only that she had a little bit of trouble with her hearing. She did not testify that her hearing was so deficient that she was incapable of securing employment. Aside from her hearing issue and the removal of melanoma on her nose approximately six years prior to the trial, the plaintiff presented no other testimony that indicated she had health issues impacting her employability.

When the defendant cross-examined her at trial regarding her employment history, the plaintiff testified that she had been employed as a secretary following her graduation from college prior to securing a position as a teacher, that she had obtained a realtor's license, and that she had worked at the retail counter at a printing business. She acknowledged that she had not attempted to secure employment in any of those fields in recent years. Further, when she was asked if she believed that she would not be hired because of her age, she answered, "[n]o." The defendant then asked the plaintiff if she believed she would be employable if she had some skills training, and she answered, "[s]ure." When the court inquired how she intended to support herself, the plaintiff responded: "I am a little nervous because I'm fifty-five and, like, what career am I going to start. I don't have the skill set to, to go and make a ton of money. Like, I know I'm just going to get some, you know, like secretary job or . . . or I'm not going to make big money or anything. But I'm hoping that I get something so that I can just move on with my life and just be my own person."

It is evident from the plaintiff's testimony that she expected to secure some type of employment, even if the salary was less than she would have liked it to be. She did not testify that she was incapable of working due to her health or lack of education. To the contrary, she had plans to reenter the job market. Despite this testimony, the court, in essence, determined that she would not be able to secure any type of employment at any time in the future and awarded her nonmodifiable, lifetime alimony.

A finding of abuse of discretion in making financial awards in marital dissolution cases is very unusual. Nevertheless, we are compelled to conclude that this is one of those rare cases because the court effectively divested the defendant of any means with which to pay the court-ordered obligations.[13] Further, the facts in evidence did not support the court's award of nonmodifiable lifetime alimony. "The issues involving financial orders are entirely interwoven. The rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." (Internal quotation marks omitted.) *Krafick* v. *Krafick*, 234 Conn. 783, 806, 663 A.2d 365 (1995). Accordingly, we must remand the matter to the trial court with direction to hold a new hearing as to all financial orders.

The judgment is reversed only with respect to the financial orders and the case is remanded for a new hearing on all financial issues; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Impermissibly double counting an asset for purposes of property and support awards also is referred to as double dipping in this and other

jurisdictions. See, e.g., *O'Brien* v. *O'Brien*, 320 Conn. 81, 120–21, 161 A.3d 1236 (2017).

[2] For purposes of this appeal, the defendant does not challenge the facts as found by the trial court.

[3] During the trial, the defendant filed two written requests for a continuance in order to retain counsel to represent him during the remainder of the dissolution proceedings. The court denied both requests. The defendant is represented by counsel in this appeal.

[4] The defendant explained that he frequently deferred the payment of taxes by taking loans from the businesses rather than taking the earnings of the businesses as income. If taken as income, he stated that taxes would be payable at that time. If taken as a loan, he stated that the taxes would be deferred until the loan was repaid.

[5] Article II, paragraph 2.4 of the plaintiff's proposed orders provides: "BUSINESS ENTITIES: The [defendant] is the sole owner of two closely held business[es] [Connecticut Computer & Consulting, Inc.] and [WriteResult], LLC. The [defendant] shall retain one hundred percent (100%) of his ownership interest. The [defendant] shall pay the [plaintiff] sixty percent of the present value of $904,000.00, which *shall not include the value prescribed to the owner's stated income contained within the business valuation if the court sets a support order as proposed* the said business interest as a [nontaxable] property payment in two equal annual installments beginning July 1, 2017, and July 1, 2018." (Emphasis in original.)

[6] The court did not provide its reasoning for this conclusion.

[7] The record reveals no discussion of the impact of the defendant's admitted alcohol issue on his insurability.

[8] On January 5, 2018, the defendant moved ex parte for a stay of execution of the alimony award pending his appeal. In his motion, the defendant requested the court to stay temporarily his $18,000 per month alimony obligation and to order him to pay $9000 in monthly alimony instead. On January 11, 2018, the plaintiff moved to terminate the appellate stay as it pertained to the defendant's obligation to pay all outstanding mortgage, insurance, and taxes due on the marital home, and his obligation to pay all outstanding federal and state taxes. The court denied the defendant's ex parte motion on February 1, 2018, and ordered an evidentiary hearing.

With respect to the plaintiff's motion, the court entered an order on June 22, 2018, following an evidentiary hearing, requiring the parties to schedule a status conference. In that order, the court noted: "The court has reviewed the rules and the evidence submitted, and has considered the testimony and the closing argument of counsel. The court's review of applicable case law, and review of its November 3, 2017 memorandum of decision . . . has compelled the court to consider whether an error was made in its trial orders. Should the court discover an error, an amended memorandum of decision will be forthcoming." The record reflects that the court did not file an amended memorandum of decision.

On November 7, 2018, however, the court filed a corrected memorandum of decision regarding the defendant's January 5, 2018 motion for a stay of execution and the plaintiff's January 11, 2018 motion to terminate the appellate stay. The court denied the defendant's motion and granted the plaintiff's motion. The court concluded that it needed "to preserve the mosaic of its dissolution orders pending resolution of the appeal." In its consideration of potential prejudice to the defendant by its decision, the court noted: "In the event the defendant-appellant prevails on appeal—which is possible based on his argument that the court 'double-dipped,' by awarding 50 [percent] of his two solely owned companies and $18,000 of alimony [monthly] out of his remaining 50 [percent] share of the companies . . . he can obtain effective relief postappeal." (Footnote omitted.)

[9] "Earning capacity . . . is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." (Internal quotation marks omitted.) *Merk-Gould* v. *Gould*, 184 Conn. App. 512, 518, 195 A.3d 458 (2018).

[10] The defendant already had paid $35,000 toward the plaintiff's counsel and expert fees as per the January 17, 2017 order of the court, *Colin, J.*, and additionally had been ordered to pay $54,048 toward the plaintiff's legal, expert and professional fees by the court, *Tindill, J.*, on April 25, 2017.

[11] We are remanding this case to the trial court for further proceedings on all financial issues because of impermissible double counting by the court for property division and support awards. We nevertheless are addressing

the defendant's remaining claim because the types of issues involved herein may arise on remand. *Antonucci* v. *Antonucci*, 164 Conn. App. 95, 119-20, 138 A.3d 297 (2016); see also *Edmond* v. *Foisey*, 111 Conn. App. 760, 773 n.14, 961 A.2d 441 (2008) (reviewing court may resolve claims that are not necessary for resolution of appeal but may arise during proceedings on remand).

[12] "[R]ehabilitative alimony, or time limited alimony, is alimony that is awarded primarily for the purpose of allowing the spouse who receives it to obtain further education, training, or other skills necessary to attain self-sufficiency." (Internal quotation marks omitted.) *Riccio* v. *Riccio*, 183 Conn. App. 823, 824 n.2, 194 A.3d 337 (2018).

[13] We note that the court ordered the defendant to pay all of the plaintiff's legal, expert, and professional fees, but failed to make any finding that the plaintiff lacked the ability to pay her own fees. "Counsel fees are not to be awarded merely because the obligor has demonstrated an ability to pay. Courts ordinarily award counsel fees in divorce cases so that a party . . . may not be deprived of [his or] her rights because of lack of funds. . . . In making its determination regarding attorney's fees, the court is directed by [General Statutes] § 46b-62 to consider the respective financial abilities of the parties. . . . Where, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so." (Internal quotation marks omitted.) *Pena* v. *Gladstone*, 168 Conn. App. 141, 152, 144 A.3d 1085 (2016).

In the present case, it would appear that the plaintiff had ample liquid funds as a result of the other orders in this case. Nevertheless, "[t]o award counsel fees to a spouse who had sufficient liquid assets would be justified, if the failure to do so would substantially undermine the other financial awards." (Internal quotation marks omitted.) Id., 152-53. The court failed to make any such determination when it ordered the defendant to pay the sum of $223,398 (in addition to $89,048 that he already had been ordered to pay under court orders), which represented the balance of all of the plaintiff's legal, expert, and professional fees.

———————————————